## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Edward "Coach" Weinhaus, Children of the Court, and Judiciocracy LLC | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) ) | Case No.: 1:25-cv-14662 |
| Board of Education of Township High School District 113, City of Highland Park, Dr. Chala Holland, *in her official capacity,* Lane Linder, *individually and in his official capacity,* Don McCord, *individually and in his official capacity,* Chief Louis Jogmen *in his official capacity*, and Officer Doe 1, Officer Doe 2, and Officer Doe 3 individually and in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) | Judge: Hon. Jorge L. Alonso |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |

### First Amended Complaint

Plaintiffs Children of the Court, Judiciocracy LLC, and Edward "Coach" Weinhaus (together, "Plaintiffs"), bring this lawsuit against Defendants Board of Education of Township High School District 113, City of Highland Park, and their officers (together, "Defendants") for violation of their First Amendment and Due Process rights under each of the United States and Illinois Constitutions; and for injunctive relief prohibiting Defendants from further violation of and restriction to their rights. Plaintiffs allege the following based on personal knowledge stemming from their acts and experiences, an investigation conducted by their attorneys, and upon information and belief.

1

## The Parties, Jurisdiction, and Venue

1.      Plaintiff Children Of The Court[1] is a Missouri non-profit corporation committed to reforming America's legal system.

2.      Children of the Court was born from a student project at UCLA, under the supervision of faculty member Edward "Coach" Weinhaus. Children of the Court meets with Judges, judicial administrators, parents, and children to improve the quality of the family law system and advocates for reforms that benefit children who pass through the court system.

3.      Children Of The Court works with children of divorce who seek access to the courtrooms where much of their childhood was decided. Parents take a confidential "Pledge" and sign up their minor children to visit courtrooms during adulthood. Custodial parents grant Children Of The Court limited access to pledgees in advance of maturity to help facilitate appropriate courtroom visits and understand the processes and procedures therein.

4.      Plaintiff Judiciocracy LLC ("Judiciocracy") is Missouri company and the nation's leading news media organization committed to providing comprehensive and accurate news coverage of misconduct in the justice system.  Judiciocracy boasts nationwide leading publications related to judicial and attorney misconduct, and various other publications concerning the changing landscape for becoming licensed

---

[1].   Children Of The Court was officially created when Judge Thaddeus L. Wilson entered an order in Cook County Case #2016CH07155 enforcing its 10-years' worth of funding and assuring the voluntary services of its founder. Recently, Judge Stanton, in the same case number oversaw issues related to Judge Wilson's overseen settlement terms. Neither Judge is a board member.

as an attorney, family law, and covering war crime trials in Israel. Judiciocracy is also a member of the Coalition Opposing Governmental Secrecy ("COGS").

5.     Plaintiff Edward "Coach" Weinhaus is a citizen of St. Louis, Missouri, and member of the Illinois, Missouri, and California Bars.

6.     Coach has been called the "nation's most aggressive judicial reformer." He serves as the CEO of Judiciocracy LLC; he is GazaPassage.org's international envoy in the Middle East.

7.     Coach is a recognized children's advocate. He founded Children Of The Court and serves as its Executive Director on a volunteer basis. In his capacity as its Executive Director he has met with judges related to the Organization's goal of improving the judicial process for children in divorce and family law matters. He is a *guardian ad litem* for St. Louis County, Missouri courts and advises parent groups on how to manage high conflict divorces. He also advises religious leaders in resolving high-conflict issues related to children among believers.

8.     Coach is recognized parent advocate. In 2008, Coach founded and led "Parkway Investigation" after (Missouri) Parkway School District's disastrous "Hit A Jew Day" was allowed to fester in a suburban school district. His activism on behalf of several hundred parents gained wide media coverage. See: https://www.youtube.com/watch?reload=9&v=l14KHxsSc58.

9.     Coach is an established media executive; he was a credentialed reporter on Capitol Hill; founded the nation's leading local media news provider in 2006; and he launched *BlockTribune*.com, a crypto-legal journal. In 2023 he also founded

3

Judiciocracy, which was sold in 2024, and where he still retains his executive positions and a minority stake.

10. Hereafter, "Coach" is used jointly to refer to Plaintiff Edward "Coach" Weinhaus individually and in his role acting on behalf of Plaintiffs Judiciocracy and Children of the Court.

11. Defendant Board of Education of Township High School District 113 (the "Board") is the governing body of District 113 ("HPHS"), which operates Highland Park High School and Deerfield High School. The Board is a body politic and corporate with authority to sue and be sued under 105 ILCS 5/10-2.

12. Defendant Dr. Chala Holland ("Dr. Holland") is the Superintendent of Township High School District 113. At all times relevant, Dr. Holland was the final policymaker for the Board with authority to establish policies and customs regarding access to school events and management of security personnel.

13. Defendant City of Highland Park (the "City") is a municipal corporation in Illinois. The City operates the Highland Park Police Department ("HPPD"), which provides law enforcement services. "HPPD" when used herein refers to the Defendant City of Highland Park".

14. Defendant Chief Louis Jogman ("Chief Jogmen"), is the Police Chief of the Highland Park Police Department and serves as the final policymaker for the City regarding police operations, training, and policies governing police presence at school events. Chief Jogmen established, maintained, or ratified the policy of retaliation which caused the constitutional violations alleged herein.

15.     Defendant Don McCord is a Dean of Students at Highland Park High School. At all times relevant herein, Dean McCord was acting under color of state law in his official capacity as a school administrator and agent of the Board.  Dean McCord is sued in both his individual and official capacities.

16.     Defendant Lane Linder is the Head of Security for Highland Park High School and District 113.  At all times relevant herein, Lane Linder was acting under color of state law in his official capacity as a security administrator and agent of the Board.  Linder is sued in both his individual and official capacities.

17.     Defendants Officer Doe 1, Officer Doe 2, and Officer Doe 3 are Highland Park Police Department officers whose identities are currently unknown to Plaintiffs. These officers participated in threatening Weinhaus with arrest on October 10, 2025, and are sued in both their individual and official capacities.  Plaintiffs will seek leave to amend to identify these officers by name following discovery.

18.     HPPD and HPHS together are the "Entity Defendants."

19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs allege violations of constitutionally protected rights and privileges.

20.     The Court has subject matter jurisdiction over supplemental matters pursuant to 28 U.S.C. § 1367.

21.     The Court has personal jurisdiction over Defendants because each of the Defendants have operated and currently operates within the Northern District of

Illinois and importantly each of the acts giving rise to the current lawsuit occurred within the Northern District of Illinois.

22.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the acts or omissions giving rise to Plaintiffs' claims occurred in this District – specifically, Plaintiffs' constitutionally protected rights were violated within the Northern District of Illinois.

## FIRST AMENDMENT - ACCESS TO A PUBLIC FORUM

23.     The First Amendment stands as the bedrock of American democracy, fiercely guarding the rights of citizens to speak, assemble, and petition in public spaces without government interference.  The First Amendment protects the right of citizens to access traditional and designated public forums for speech, assembly, and press activities.  A ticketed public event held by a government entity on government property, open to the general public for admission upon payment, constitutes at minimum a "limited public forum" or "designated public forum" for First Amendment purposes.

24.     HPHS Homecoming was a ticketed event open to the general public. Anyone could purchase a ticket and attend.  The school did not limit attendance to students, parents, or school-affiliated individuals.  By opening the event to the public and selling tickets, Defendants created a designated public forum, at least for the duration of the event.

6

25.     On October 10, 2025, a major public event was being hosted by District 113 under the supervision of Dr. Holland – the HPHS Homecoming Football Game and Half-Time Show ("Homecoming").

26.     Plaintiffs jointly purchased a Homecoming ticket to the event for $6.

27.     In a designated public forum, government officials may not exclude individuals based on their viewpoint or engage in content-based discrimination. While reasonable time, place, and manner restrictions are permissible, exclusion of a ticketholder based on prior criticism of government officials is unconstitutional viewpoint discrimination.

28.     At minimum, even if Homecoming is not a traditional or designated public forum, the Due Process Clause prohibits government officials from arbitrarily excluding a ticketholder from a public event based on retaliatory or viewpoint-discriminatory motives

29.     Plaintiffs have rights under the First Amendment to the United States Constitution and the Illinois Constitution to attend Homecoming.

30.     'Coach's purchase of a ticket created a property interest in attending the football game, at least for the duration of the event. While school officials may possess authority to remove disruptive attendees, they may not deprive a ticketholder of the opportunity to attend the event without any procedural protection.

31.     At minimum, where school officials admit that allegations against a ticketholder are false and that the issue could be resolved without removal, due

process requires allowing the ticketholder to remain, particularly where the true motive for removal is retaliation for protected speech.

32. This is all the more so true when the ticketholder had been entirely compliant with all behavioral rules, had followed the school's orders on where not to go, and showed flexibility on other space limitations to be able to enjoy the game and event.

**COACH'S COURT-PROTECTED RIGHT TO SCHOOL EVENTS**

33. Coach is a custodial parent of two HPHS students (and three former HPHS students). As such, he is the beneficiary of multiple Court orders specifically noting his rights to attend all of his children's school events without limitation. HPHS and its staff are fully aware of these provisions as ordered by the Illinois Unified Court System.

34. Accordingly, HPHS and Dr. Holland knew or should have known that Coach was allowed access to Homecoming as a parent, exercising basic parental rights, his custodial rights, and court-protected rights.

**COACH'S ACTIVISM RELATED TO THE SECURITY FAILINGS AT HPHS**

35. Coach has been an HPHS parent, booster, and volunteer since his eldest child first attended 9th grade there in 2017.

36. Coach has never been in any form of physical altercation with any administrator, Coach, parent, or student at any event in those 9 years.

37. He has been a model fan and parent in attending events showing respect for those around him, including the other teams and their parents. He is found mostly

recording highlights of his own children or their friends and sending them to the kids'
friends' parents to preserve memories.

38.     Coach has never been asked to leave any HPHS event as a result of his
conduct.

39.     In the football season of 2018-19, while teaching in Los Angeles, CA and
studying full-time in St. Louis, MO, he became HPHS football team's most traveled
booster – attending all games as an out-of-town visitor to home and away games.

40.     He has also volunteered at the school multiple times for the student
body's benefit. In both school years 2017-18 and 2018-19, he volunteered to teach
multiple sessions of the Entrepreneurship coursework.[2]

41.     He participated in school events whether his own children attended or
not. For example, in 2023 and 2025, he attended the Hebrew course end-of-year
celebration, participating in Hebrew lessons, Hebrew songs, and even Israeli dancing
at the teacher's request.

42.     In 2024, he chaperoned the school-sponsored post-graduation party
events alongside other parents.

43.     In the fall of 2025, prior to these events, he attended an HPHS Football
away game.

**ORIGINAL HPHS SECURITY INCIDENT**

44.     Coach's experience with HPHS's Security Team and Administration
suggest they believe they have the right to interfere with Coach's protected rights.

---

2.  Coach was UCLA's highest-rated entrepreneurship faculty upon leaving in 2023 where he had worked
since 2016.

45.    On October 22, 2018, Coach spent a full-day teaching four entrepreneurship courses with freshman at HPHS. The teaching day went well with the faculty observing all the interactions and thanking Coach for taking time with the students (teaching "Compound Interest").

46.    Nonetheless, shortly thereafter the school filed a false report with DCFS (the "False Claim") against Coach – a report now stored in Illinois' False Claims Database – for false events manufactured by an outsider (upon information and belief, the children's *former* stepfather). The report had nothing to do with any of Coach's fully-observed conduct in class at HPHS.

47.    The False Claim was deemed "Unfounded" by DCFS and added to the False Claims Database.

48.    After these findings, HPHS's Security team acted as if the opposite were true.

49.    They escalated a situation at a child's basketball game in the winter of 2019 when, the then-head of security of HPHS, accosted Coach at a game, in front of his custodial children, to retaliate against Coach for having the False Claim added to the False Claims Database.

50.    Coach explained his custodial rights, that the matter was fully adjudicated in Coach's favor in both a court of law and via DCFS's review process, and that he preferred to be left alone at events.

51.     HPHS's Security would not leave Coach alone and pressed him not to attend games with no right to do so under the law and in direct contravention of custodial orders.

52.     HPHS's Security then punished Coach further. Even though they had never observed anything close to misconduct, the school put Coach on a school "watchlist" and was required to be accompanied by a security escort while on school grounds.

53.     The tide shifted in the summer of 2019 after Coach's persistence and diligence in the face of HPHS' unwarranted pressure. Coach's eldest son was ordered into Coach's sole primary residential custody.

54.     Coach immediately de-registered him from HPHS.

55.     Shortly thereafter, Coach's second oldest son was placed in his sole primary residential custody and was also immediately de-registered from HPHS.

56.     HPHS was furious that Coach was removing members of its student body – and prominent student athletes – for loss of funding and prestige and sought to escalate its conflict with Coach.

57.     Since the False Claim involved this second oldest son, who was now in his sole primary residential care, Coach requested HPHS remove him from the "watch list." The administration complied.

## SECOND HPHS SECURITY INCIDENT

58.     In 2023, Coach visited HPHS by invitation for an event. When the event ended, he did as he saw other parents do to observe children at lunch time but only did so by standing with a security guard.

59.     He used the opportunity to learn about what he suspected were major security flaws at HPHS that were failing to protect the students. After some time, he left without any incident while observing the students.

60.     Immediately thereafter, Coach was re-added to the "watchlist" to retaliate against Coach for observing HPHS Security.

61.     HPHS, through its Superintendent and administrative staff, maintains a *de facto* policy authorizing security personnel and administrators to place parents, media representatives, and visitors on a "watch list" that restricts their access to school events without any objective standards, due process, or requirement of actual misconduct.

62.     This "watch list" policy authorizes school officials to impose restrictions on individuals based on subjective determinations of whether an individual is perceived as critical of school administration, without any requirement that the individual have engaged in disruptive conduct or pose a genuine safety threat.

63.     The "watch list" policy is maintained and implemented by the District's administration, including Dean McCord, and security department, and decisions regarding placement on the watch list and restrictions imposed are made by school

12

officials with policymaking authority, including the Superintendent, Dean of Students Don McCord, and Head of Security Lane Linder.

64.     The policy and custom have been applied to Coach on multiple occasions in 2018, 2019, 2023, and October 2025, demonstrating that it is not the result of individual employee misconduct but rather reflects the District's established practice.

65.     The Board of Education has knowingly acquiesced in this policy through its failure to establish any objective standards, procedures, or oversight mechanisms for the "watch list," despite being aware that the watch list has been used to restrict access to school events for multiple individuals, including Weinhaus.

66.     This policy of restricting access based on criticism of school officials, rather than actual misconduct or safety concerns, has been applied on multiple occasions and upon information and belief, HPHS has used the watch list to restrict access to school events for other parents and community members who criticized school policies or administrators.

67.     Moreover, The Board of Education has failed to adequately train its administrators and security personnel regarding the First Amendment rights of parents, media representatives, and advocacy organizations to attend public school events, and the constitutional limitations on restricting access to such events.

68.     The Board's failure to train is evidenced by the absence of any written policies, training programs, or guidelines addressing:

      a.  The constitutional rights of media organizations to attend and report on public school events;

      b.  The rights of advocacy organizations to engage with parents, fans, faculty, coaches, and students at public events;

c. The prohibition on viewpoint-based or retaliatory exclusions from public school events;

d. The requirement that any exclusion be based on objective safety concerns or actual misconduct;

e. Procedural protections required before excluding individuals from school events.

69. This failure to train demonstrates deliberate indifference to the constitutional rights of school event attendees, as the need for such training is obvious in light of the recurring issue of disputes regarding access to school events and the clear requirements of the First Amendment.

70. The Board's deliberate indifference directly caused the constitutional violations alleged herein, as trained administrators would have known that excluding Plaintiffs based on prior criticism of the school, without objective safety justification, violated clearly established First Amendment principles.

71. The Board of Education, through its Superintendent and administrative staff, maintains a *de facto* policy and widespread custom of restricting parents' and visitors' access to school-sponsored public events based on whether the individuals have criticized school officials, security practices, or administrative decisions, rather than on objective safety concerns or actual disruptive conduct.

**COACH ALERTS THE ADMINISTRATION TO SECURITY FAILINGS**

72. Coach observed a number of interactions by and between HPHS's Security, surmising that there were serious personnel issues.

14

73.     Coach informed HPHS of his background as a parent activist and scheduled a meeting with the then-Superintendent to discuss HPHS security, security personnel, and strategies for fixing the problems.

74.     Coach outlined multiple observed issues to the Superintendent during a meeting in the Spring of 2023.  Observations included:

    a.  Security personnel were focusing energy on minor issues while ignoring important matters;

    b.  Security personnel often involved themselves in extrinsic matters, neglecting their  primary responsibilities; and

    c.  Recommended particular staffers be either relieved or not promoted.

75.     The Spring 2023 was successful in so far as none of the staffers who Coach recommended be relieved were further retained.

76.     Unfortunately, Coach's predictions came to bear and in 2025 HPHS's Security admitted to serious security incidents related to images of the children in the bathroom.  These incidents were widely reported.

77.     One of the first and most prominent news outlets – the *Lake County Gazette* – sought Coach for a statement due to his activism during "Hit a Jew Day" and his warning about HPHS's security failings.

78.     It published a quote from Coach immediately after the incident became public (Exhibit A).

15



**Parent, activist Weinhaus comments on school bathroom recordings: 'They've gone from needing far better security personnel to far better lawyers'**

SCHOOLS

Highland Park High School | Wikimedia Commons / WestportWiki

By Lake County Gazette Reports
Feb 12, 2025

79.     Coach, a known activist, civil rights attorney, and parent of five HPHS students, said:

*"They've gone from needing far better security personnel to far better lawyers."*

80.     Coach also reported that he had forewarned about security failings at HPHS years earlier.

81.     With the schools' tepid response to security breach, Coach was continually sought by the press for comment on the scandal, advocating for parent activism as he had done during Parkway's "Hit A Jew Day" a decade and a half earlier, headlining two more stories:

    a.  "Parent, activist Weinhaus calls out North Shore School District 112 for lack of transparency in staffing changes amid bathroom camera scandal" *Lake County Gazette*, Feb. 21, 2025[3].

---

3.      https://lakecountygazette.com/parent-activist-weinhaus-calls-out-north-shore-school-district-112-for-lack-of-transparency-in-staffing-changes-amid-bathroom-camera-scandal/

    b.  "Weinhaus on D113's response to bathroom recording incident: 'It seems accountability at schools is something for parents to take into their own hands'" *Lake County Gazette*, Mar. 5, 2025 [4].

82.    HPHS was aware of the *Lake County Gazette* articles (the "Articles"), Coach's quotes, and sought to retaliate against him for speaking publicly about the issue, particularly by limiting his ability to organize as he had done previously.

83.    In the Spring of 2025, Coach requested HPHS advise him of any concerns related to abuse from his children's former stepfather after his children's mother made allegations public related to his abuse of her that affected one or more of Coach's minor children. HPHS was aware of the alleged abuse, (the "Stepfather Abuse") as made public by the children's mother. <u>See</u> Attached Exhibit A.

## COACH AND JUDICIOCRACY'S ACTIVISM RELATED TO HPPD'S COVERUPS

84.    Coach has had multiple negative interactions with HPPD since 2015, culminating in litigation where he serves as counsel for Judiciocracy LLC in a case in Lake County against HPPD (Case #2025CH00000070 – "HPPD1 Case").

85.    On or about March 19th, 2025, HPPD refused to produce police records to requestor-turned-Plaintiff Judiciocracy that they later had to produce, and yet continue to invent wild, inconsistent claims on their failure, including refusing to produce a presumptively public audio call no FOIA Officer seems to have ever reviewed (the "FOIA Stonewall").

---

4.  https://lakecountygazette.com/weinhaus-on-d113s-response-to-bathroom-recording-incident-it-seems-accountability-at-schools-is-something-for-parents-to-take-into-their-own-hands/

86. HPPD contended that they need not share records before the HPPD1 Case judge because Coach was one of the attorneys representing Judiciocracy. When the Court poo-poohed that defense, HPPD admitted to the judge that the FOIA Stonewall served to hide multiple records from Plaintiffs Coach and Judiciocracy.

87. While initially HPPD refused to produce any public documents or acknowledge the existence of the same; following the partial denial of HPPD's Motion to Dismiss, HPPD's counsel admitted public documents exist and produced a heavily redacted response on October 1, 2025 – still obfuscating the width and breath of HPPD's conduct.

88. In an interview on January 30, 2026, an HPPD police record supervisor admits that it limits who it releases audio calls based on the identity of the requester, not only if the requester is the caller which waives any privacy concern. See HPPD1 Plaintiff's filing of Feb. 5, 2026 for link to interview.

89. The trickle of information thus far released covers no fewer than 10 separate police incident reports in 2024 alone, including incident report numbers 2024-00003476, 2024-00004170, 2024-00004262, 2024-00004580, 2024-00011538, 2024-00014914, 2024-00015855, 2024-00016870, 2024-00017088, 2024-00017987 including the residence of where Coach's children lived and were discussed in Exhibit A. Coach was neither involved in nor present for any of the above incidents.

90. These incidents form the backbone of Coach's children's mother's allegations related to the Stepfather Abuse experienced by Coach's children in Exhibit A.

91.     HPPD hid all of the police incidents from Judiciocracy as part of the FOIA Stonewall, until the Court's partial denial of its Motion to Dismiss.  Thereafter, Defendant adduced only heavily redacted public documents.

92.     HPPD hid all of the police incident reports and audio calls as a result of Coach requesting the information on the other Plaintiffs' behalf as their attorney.

93.     At the time of filing, HPPD is still shirking its obligations under FOIA in a misguided attempt to hide records related to Steven Cohen, the children's former stepfather, who has a close personal relationship with numerous individuals within HPPD.  For example, upon information and belief, in one incident, Mr. Cohen had HPPD make outgoing calls for him. Although described in the narrative, the records of these calls have still not been produced.

94.     As a result of the above and Plaintiffs' ongoing investigation into HPPD coverups, including denying producing 911 calls under a dubious review, HPPD has retaliated against Coach.

95.     The City of Highland Park, through its Police Department, maintains a policy, custom, or practice of deferring to school officials' requests to remove individuals from school events without conducting any independent assessment of whether probable cause exists for arrest or whether the removal violates individuals' constitutional rights.

96.     On October 10, 2025, HPPD officers, Officer Doe1, Officer Doe 2, and Officer Doe 3 threatened to arrest Weinhaus for "trespassing" at the direction of school officials, despite:

a. Weinhaus having purchased a ticket to the event;

b. Weinhaus having parental rights to attend his children's school events;

c. Weinhaus having engaged in no conduct that would constitute criminal trespass under Illinois law; and

d. The officers having no independent probable cause to believe a crime had been committed.

97.    This policy of rubber-stamping school officials' exclusion requests without independent probable cause determination has been applied on multiple occasions and upon information and belief, HPPD has threatened arrest or removed other individuals from school events at school officials' request without independent probable cause assessment.

98.    The City of Highland Park, through its Police Chief and other policymakers, has failed to train HPPD officers regarding:

a. The requirement of probable cause before threatening arrest;

b. The First Amendment rights of media and advocacy organizations at public school events;

c. The constitutional limitations on trespass enforcement at ticketed public events;

d. The prohibition on effectuating retaliatory exclusions at the behest of government officials.

99.    This failure to train reflects deliberate indifference to constitutional rights, as the need for such training is obvious given the regular deployment of HPPD officers to school events and the foreseeable constitutional issues arising from school-police coordination in managing event access.

100.    Moreover, HPPD's participation in removing Weinhaus from the football game was motivated by retaliation for Judiciocracy's and Weinhaus' pursuit of public records through FOIA litigation and investigation of HPPD, as demonstrated by:

   a.  temporal proximity: HPPD had just admitted, in HPPD1, that it had improperly withheld public records from Judiciocracy;

   b.  Excessive officer involvement in what should have been *crowd management*;

   c.  HPPD officers acted at the direction of school officials without any independent probable cause to arrest Weinhaus for trespassing, demonstrating that HPPD's purpose was to facilitate HPHS's retaliation; and

   d.  HPPD's continued monitoring of Weinhaus even after he left school property

**HOMECOMING GAME PRIOR TO FIRST AMENDMENT VIOLATION**

101.    Coach, individually and in his capacity as a representative of Children of the Court and Judiciocracy, attended Homecoming.

102.    Children Of The Court had multiple beneficiaries of parental Pledges attending Homecoming that evening.   Children of the Court's attendance at Homecoming was in furtherance of its mission and to advance its advocacy work.

103.    Based on Coach's public advocacy for Children of the Court and its members, it was widely and publicly known by HPHS what its mission was and that its beneficiaries, including at least, Weinhaus's own children and other prospective members, would be at the Homecoming Game. Further, HPHS knew that Children of the Court would wish to speak with them, advocate for them, and discuss the important issues it illuminates to parents and other prospective members.

104.    Judiciocracy's attendance was in pursuit of its investigation of the Highland Park Police Department about which they were highly aware due to the litigation HPPD1 having revealed a cover-up of records.

105.    Both HPPD and HPHS were aware of Judiciocracy's and Children of the Court's activism (through Coach) in advance of the Homecoming game due to Coach's prominence as a judicial reformer – which relate to both Judiciocracy and Children of the Court's missions.  Coach was referred to in this manner in one or more of the above-referenced Lake County Gazette articles.

106.    After a brief walk across the front of the stands, Coach situated himself to the south of the bleachers, towards the scoreboard, to be able to keep an eye on the game, the score, the students, security, and HPPD.

107.    Coach did not speak to anyone or say anything other than the "oohs" and "ahhs" of typical cheering at a noisy Homecoming game.

108.    Sometime midway through the Second Quarter, a female student ("MFG") accosted Coach and made an obscene gesture at him.

109.    Coach performed no actions of any kind to anyone to instigate the interaction.

110.    While bearing down on Coach from above, MFG began by demanding Coach explain his presence in heated tones saying:

**MFG: Can I help you?**
**Coach: Would you like to?**
**MFG: No. I would not. What are you doing here?**
**Coach: Watching the game and seeing the students.**
**MFG: Why?**
**Coach: Because I want to.**

**MFG: Don't you think that's creepy?**
**Coach: Nope.**
**MFG: Well I do.**
**Coach: Well, I'll ask again. Would you like to help me?**
**MFG: No, I'm going to get you kicked out of here.**

111. MFG's last statement was uttered in a fit of rage and accompanied by another obscene gesture – she gave Coach the "middle finger." ("MFG Inappropriate Conduct Incident.")

112. Coach maintained a pleasant attitude and at all times maintained a demeanor appropriate for a children's advocate and licensed Guardian *ad litem* (Missouri state courts). Coach performed no objective behaviors worthy of MFG's contact or scorn as Coach did not know MFG.

113. MFG, upon information and belief, attacked Coach based on his role as a public advocate as described above.

114. MFG then walked into a crowd of students directly to McCord.

115. Upon information and belief, MFG demanded Coach be removed from the game.

116. Within approximately five seconds of being approached by MFG and without any due consideration or discussion or contemplation, McCord made a beeline for Coach.

**DEAN MCCORD VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS I**

117. Immediately, Dean Don McCord approached Coach. At all times herein, Dean McCord served as the Dean and agent of HPHS and was working in his official capacity.

23

118.    Coach and Dean McCord are familiar with each other. Dean McCord coached several of Coach's children in basketball.

119.    Dean McCord asked Coach to leave the game.

120.    Coach refused stating he had a right to be there.

121.    Dean McCord insisted he leave but gave no basis relating to Coach's conduct, threatening to have him arrested for trespass.

122.    Dean McCord demanded Coach not sit in the stands.

123.    Dean McCord had HPPD and HPHS security sit with Coach's children to ensure they could neither see nor be seen by their custodial parent, Coach.

124.    Dean McCord stated he would have Coach removed by force for trespassing if he were to sit in the stands ("First Limitation of Right").

125.    The First Limitation of Rights served as a restraint of Coach's freedom of movement.

126.    The First Limitation of Rights served as a restriction of access by a custodial parent to his own minor children.

127.    Thereafter, Coach remained near security at all times, keeping watch to ensure neither MFG nor any of her fellow students snuck up on Coach, or created further public disturbance with obscene gestures, while enjoying the game and seeking to say "hello" to his children should he see them.

### MFG BECOMES IRATE THAT COACH WAS NOT REMOVED

128.    Until this time, Coach had not reported the MFG Inappropriate Conduct Incident to Dean McCord because he did not want to create a furor over an emotional

24

teenage girl nor risk increasing the disruption to all of the attendees, including his own children.

129.    Immediately thereafter, MFG began clamoring down from the stands, wild-eyed, making calls, speaking to security, and creating a single-person scene.

130.    Coach, restricted from going into the stands by the First Limitation of Rights, was stuck having to watch his back from MFG and what were any number of potential co-agitators.

131.    Additionally, MFG's aggressive actions and insistence that Coach be removed, made it all the more important for Coach to be observed by security to ensure Coach not suffer additional false allegations of harassing conduct from afar.

132.    But Dean Don McCord and the HPPD were busy sitting with Coach's children enforcing the First Limitation of Rights, all the while aware that Coach would have liked to have said "hello" to his children should he come upon them at the concession stand or near the facilities.

133.    As a result, Coach oscillated between standing near security guards and watching the game from various angles, careful never to sit in the stands nor to venture near the student section for risk of being arrested for "trespassing."

134.    Coach never interacted with MFG in any way thereafter – no touching, no eye contact, no waving, no facial acknowledgement - no interaction at all while maintaining his own safety by keeping near security.

135.    Plaintiffs did try to observe security's ability, or inability, to deal with a histrionic student for purposes of further observation of HPHS's Security and ultimately HPPD's effectiveness.

136.    Coach spoke to nobody else at the game, being prevented from free access, save for a concession purchase, until the Second Limitation of Rights.

## SECOND LIMITATION OF RIGHTS – REMOVAL UNDER THREAT OF ARREST

137.    After the halftime show, much of the crowd left, including presumably Coach's children.

138.    Coach would have liked to have then been allowed to sit down but was not permitted due to the First Limitation of Rights.

139.    Midway through the third quarter, Dean McCord again approached Coach who stood safely near two security guards and away from the stands from which Defendants forbade him.

140.    Dean McCord waived over three HPPD police officers and the head of HPHS's Security Lane Linder who at all times was working in his official capacity for HPHS.

141.    MFG watched in the distance to the right of the concession stand.

142.    Dean McCord demanded Coach leave the game or to be arrested for trespassing.

143.    Coach asked if they were joking.

144.    Dean McCord stated that he was not joking.

145.    Coach asked for the reason.

146.    Dean McCord stated the reason for Coach removal included the following:

    a.  His children had left; and

    b.  A girl was uncomfortable with Coach's presence because Coach was not in the stands seated but rather 'following her.' Dean McCord knew when he said this that it was false because he admitted in writing that Coach was trying to say "hello" to his children.

147.    Coach explained he has not talked to anybody during Homecoming except for  MFG, who had approached and accosted him, plus Dean McCord; that he stood near security at all times; and that it was HPHS's responsibility  to manage student behavior, not restrict the public or a parent's rights without basis, especially when Coach's conduct was specifically limited and directed by Dean McCord himself.

148.    Coach further stated that removing the earlier improper First Limitation of Rights would solve the problem because Coach could then sit in the stands and whoever claimed to be uncomfortable could instead stay away from Coach.

149.    Dean McCord admitted that it was his own restriction that caused the issue.  He then said that "it didn't matter because [MFG] is uncomfortable. It's too late." Coach noted that the uncomfortable student conducted the Inappropriate Conduct Incident and reiterated it was HPHS's responsibility to manage its students, not restrict the public's and parental rights. By implication, it was clear that she was uncomfortable prior to the allegations he knew to be false about Coach's conduct.

150.    Dean McCord and Linder both stated the school was private property and they could remove anyone they wanted if it made a student uncomfortable.

151. Coach corrected them, stating that it was a public event, that HPPD must have an objective basis for removal, and implementing a restraint on Coach and then blaming him for its consequence could not form the objective cause for removal under any constitutional standard.

152. An HPPD officer stated he would remove Coach by putting him in handcuffs if he did not leave. Although unable to cite the code, the HPPD officer stated the arrest would be for "trespassing."

153. Coach informed the five of them that:

    a. Coach had paid to be at a public event and had various protected rights to be there under state and federal law;

    b. they knew they lacked the required objective basis to support their limited right of removal;

    c. any basis for removal was particularly foreclosed as Coach was near security on purpose to protect himself physically and from MFG's histrionic allegations; and

    d. even if they did have some basis, that basis was a result of their own violation of Coach's rights.

154. Dean McCord then admitted that he was aware that another allegation made against Coach – that Coach yelled his child's name at a crowded football game – was baseless from the near decade-long history of Coach's conduct at public events.

155. Dean McCord also affirmed that his personal experience with Coach would suggest that he knew the claim was made falsely *and* for an improper purpose.

156. Coach directly stated the five present HPHS and HPPD staff admitted they knew they were violating his rights by removing him from Homecoming under threat of arrest.

157.    Linder, HPHS's head of security who took the brunt of Coach's public comments in February and March 2025 (made to the *Lake County Gazette*), had conspired with HPPD and McCord in advance of this confrontation and sought to directly retaliate against Coach.

158.    In response to Coach's statements, Linder said, "We know who you are" indicating that the five offenders directly targeted Coach based on "who he is" – this was not stated in the context of a hidden identity but rather that Coach is a known activist.

159.    Linder went on to say, "I have what is necessary to have you removed and the police are going to remove you forcibly and put you under arrest you if you don't leave."

160.    Rather than face public arrest by two parties retaliating against him or allowing his children to be humiliated by out-of-control cops and high school rent-a-cops, Coach offered the following compromise ("The Deal") under duress and threat of illegal retaliatory arrest:

      a.  Coach's ticket would be refunded – to which Dean McCord immediately agreed;

      b.  Coach would publicly tell the five HPHS and HPPD staffers to turn around and walk away from him and they would do so in the full view of the crowd;

      c.  Coach would walk to the end of the fence by the north side of the stands and finish watching the third quarter alone; and

      d.  Because his children were no longer there, Coach would leave of his own accord, with no escort, and on his own after the third quarter and not with escort.

161.    The Deal was crucial in ensuring that Coach maintained whatever remained of his rights, dignities, and the freedom to leave of his own accord so as not to have his children humiliated and harmed after the abusive household from which their mother contends publicly they were just emerging.  See Exhibit A.

162.    Dean McCord assented and stated further that Coach would be allowed to "come back." ("Right of Return").

163.    Absent any part of The Deal, Plaintiffs were being forced out of the game with a further loss of rights.

164.    Dean McCord offered Coach the "Right of Return" to school events because there was no objective basis for removal from Homecoming or any other event, ever.

165.    Upon their expression of agreement, Coach loudly told the five HPHS and HPPD staffers to "beat it and walk away" (as per The Deal), which four of the five of them did.

166.    The police turned around and walked away as did Linder, the security chief.

167.    But Dean McCord insisted Coach would be under threat of arrest if he didn't leave and that he then insisted to personally escort Coach out in violation of The Deal.

168.    Coach stopped at the fence where Coach stated he would remain per The Deal until he could leave of his own accord.

169. Dean McCord again stated he was under threat of arrest if he did not leave immediately.

170. Coach ensured the Giants had the victory well-in-hand with a quick look at the scoreboard and assured Dean McCord he would leave of his own accord shortly.

171. Dean McCord again threatened Coach with a trespassing charge and arrest if he did not leave.

172. Dean McCord continued to remind Coach that he was under threat of arrest if he did not leave.

173. Coach left with McCord escorting him out under threat of arrest.

174. The event that included Coach, McCord, Linder, and the three HPPD officers requiring Coach leave the game under threat of arrest without any objective reason to limit access to a public forum is the "Second Limitation of Rights."

175. Dean McCord's and Lane Linder's stated justifications for removing Weinhaus from the football game were pretextual, as demonstrated when:

    a. Dean McCord admitted to Weinhaus that MFG had initiated the confrontation with Coach, had behaved inappropriately by giving him the middle finger, and that Coach had not engaged in any conduct toward MFG after she walked away and if there were any conduct it was solely for the purpose to say "hello" to his own custodial. Dean McCord further admitted that one allegation against Weinhaus—that he yelled his child's name at the game—was baseless and that McCord's personal experience with Coach suggested the complaint was made falsely;

    b. If student comfort were the true concern, the appropriate response would have been to ask MFG to avoid the area where Coach was standing, not to remove Weinhaus from the entire venue. Dean McCord himself acknowledged that lifting the First Limitation of Rights, *allowing Coach to sit in the stands*, would solve the problem because Coach could sit in one location and MFG could stay away

31

from him. Dean McCord's refusal to adopt this obvious solution demonstrates that student comfort was a pretext;

c.  The claim that Coach's children leaving justified removal makes no sense, as parents routinely remain at sporting events after their own children leave, and there is no policy requiring parents to leave when their children depart. Dean McCord offered no legitimate explanation for why a parent's presence becomes impermissible once his children are no longer present;

d.  Lane Linder's statement "We know who you are" was made in the context of discussing Coach's activism and media criticism, not in the context of a *secret* identity. This statement, combined with Linder's role as the target of 'Coach's public criticism in the *Lake County Gazette* demonstrates that the removal was motivated by Coach's protected speech criticizing HPHS security and Linder's performance;

e.  The timing and coordination of the removal demonstrate retaliatory intent:

    i.  Linder, who had been personally criticized *by role* in Coach's media quotes, actively participated in and advocated for Coach's removal;

    ii.  Three HPPD officers were summoned, an unusually large law enforcement response to a parent watching a football game, demonstrating that this was not routine crowd management; two more observed from several yards away;

    iii.  The threat of arrest for "trespassing" was legally baseless, as Coach had purchased a ticket and engaged in no conduct constituting trespass under Illinois law; and

    iv.  After Coach left, HPPD officers remained positioned to monitor him, even off school property, demonstrating that the concern was ongoing surveillance of a critic, not immediate crowd safety.

f.  Defendants' breach of the agreement they made with Weinhaus further demonstrates pretext and retaliatory motive:

    i.  Dean McCord agreed to refund Coach's 'ticket but never did;

    ii.  Dean McCord agreed to allow Weinhaus to leave "of his own accord" after the third quarter but instead insisted on

32

personally escorting him out under continued threat of arrest; and

    iii. The "Right of Return" promised by Dean McCord was immediately violated when HPPD officers monitored Weinhaus to ensure he did not return that evening.

g. These facts, taken together, demonstrate that the stated justifications were pretextual and that the true reason for removing Weinhaus was retaliation for his protected speech criticizing HPHS's security failures and HPPD's FOIA violations.

176. Dr. Holland monitored McCord and Linder throughout the evening and was aware of the goings-on described herein. Dean McCord updated her when the game ended that Coach had left.

## ABROGATION OF PLAINTIFFS' RIGHTS AND MATERIAL DAMAGES

177. Plaintiffs attempted to continue their work from the sidewalk of Wolters' Field outside the school's property.

178. Two of the three HPPD officers from earlier stood within 20 feet of Coach to ensure Coach did not exercise his "Right of Return" to Homecoming.

179. Coach watched the game when he had time, but his sight was restricted because the sidewalk is hundreds of yards from the field ruining the remainder of his evening.

180. Judiciocracy used the sidewalk view to observe the police officers who came to menace Coach and how the officers interacted with students and parents.

181. Children Of The Court informally interviewed several departing students.

182. HPHS did not return Coach's ticket fee.

183. The HPHS Giants won 38-13.

## RISK OF SERIOUS CONTINUED LOSS OF RIGHTS AND HARASSMENT

184. Plaintiffs face imminent and ongoing threat of future constitutional violations by Defendants and Defendants have shown a willingness to use pretextual bases to remove Plaintiffs from further events.

185. Dean McCord's offer to Coach was violated:

   a. He did not return the ticket price;

   b. He did not allow Coach to leave of his own accord;

   c. The Right of Return certainly did not apply that evening as Dean McCord was in direct contact with school officials to monitor when Coach left and he was being watched by HPPD officers even on the sidewalk.

   d. Only with this Court's help and as a result of the Court's December 4, 2025 Order (Dkt. 12) in response to Plaintiffs' Emergency Motion For Preliminary Injunction Pursuant To Fed. R. Civ. P. 65(a), can Coach protect his rights – protection he will continue to need;

   e. Even after the order was entered, HPHS sought to limit Coach's ability to speak to his custodial children's coaches about public record matters under threat of retaliation by counsel, precisely for his activism.

186. The threat of future harm is not speculative, Defendants have:

   a. Admitted they possess discretion to exclude attendees from school events based on subjective determinations of one student's "comfort";

   b. Demonstrated willingness to use pretextual justifications to mask retaliatory and target-specific ("we know who you are") intent;

   c. Breached their own promises regarding future access; and

   d. Failed to adopt any policy reforms or acknowledge wrongdoing (absent action taken first in Lake County, but then removed to this Court).

187.    Plaintiff Weinhaus has already endured escalating harm at the hands of Defendants as a result of his reporting – a protected First Amendment activity – *id est*:

    a.  HPHS placed Weinhaus on "watch list" and required security escort;

    b.  HPHS security "pressured" Weinhaus not to attend events which would have put him in violation of his own custody order;

    c.  HPHS re-added Weinhaus to the "watch list" in retaliation for observing security;

    d.  HPPD stonewalled Judiciocracy's FOIA requests; and

    e.  The public removal and threat of arrest at the Homecoming football game.

    f.  The coordination of activities between HPPD, HPHS, and their agents to join together with their respective retaliatory motives to take on each other's disregard for Coach's rights to have him removed under threat of arrest from a public event.

188.    That is, all Defendants, once they coordinated action to remove rights are 'in it' together against Coach and the Plaintiffs.

189.    Without injunctive relief, Plaintiffs will continue to suffer irreparable harm and, Defendants will:

    a.  Continue to rely on pretextual bases, eg.: "a student who gave you the middle finger and initiated the only contact Coach had with anyone is uncomfortable" to limit Plaintiffs' access to public spaces;

    b.  Disregard Coach's custodial rights and various court orders directing HPHS to protect his rights;

    c.  Create restraining orders against Coach, even away from his own custodial children, a power vested exclusively with the Courts; and

    d.  Subjectively limit Plaintiffs' rights to Plaintiffs' detriment.

190.  Monetary damages are an inadequate remedy because: (a) the ongoing chilling effect on First Amendment rights cannot be fully compensated; (b) the harm to 'Coach's relationship with his children is irreparable; and (c) Plaintiffs seek to engage in future speech and attend future events, which requires prospective injunctive relief, not merely retrospective damages.

191.  Defendants' actions have caused and will continue to cause significant ongoing harm to Plaintiffs' constitutional rights, including:

    a.  Chilling Effect on Judiciocracy's Journalism - The First Amendment protects the right to gather news, and Defendants' actions have directly impaired Judiciocracy's ability to perform its journalistic mission;

    b.  Ongoing Restriction on Children of the Court's Advocacy – interference with court-ordered funded mission of the organization;

    c.  Deprivation of Coach's' Parental Rights - the ongoing deprivation interferes with his fundamental right to participate in his children's educational activities and violates court orders protecting his custodial rights;

    d.  Damage to Reputation and Professional Standing: The public confrontation and threatened arrest have damaged Coach's' reputation as a parent, attorney, and children's advocate; the stigma of being publicly ejected from a school event under threat of arrest has continuing harmful effects; and

    e.  Defendants' Pattern Demonstrates Intent to Continue Violations: Defendants refuse to acknowledge their wrongdoing, have not revised their policies or practices, and have continued to resist Plaintiffs' FOIA requests evincing an intent to continue restricting Plaintiffs' access to public events and retaliating against protected speech.

192.  Defendants are likely to further limit Plaintiffs' rights absent action of this Court.

193.  Plaintiffs' rights are all in the public interest.

36

a. HPHS and HPPD are both 'stories' of interest for Judiciocracy LLC. Its staff being restricted and targeted will limit coverage of these deeply flawed public institutions to the public's detriment;

b. Children Of The Court will be limited in its court-ordered-funding's public purpose by restricting access to its Pledgees; and

c. Coach's children's access to their parent will be limited.

194.   Plaintiffs are at risk of further limitations of their rights at the hands of the Defendants as a result of the First and Second Limitation of Rights, especially given Dean McCord's statement on behalf of HPHS that he controls access to these public spaces.

195.   Dean McCord and Linder's abuse of law enforcement resources is a direct affront to the authority of the Courts Due Process, and the First Amendment.

196.   Absent injunctive relief, Plaintiffs' First Amendment right to attend public events will be abrogated and unlawfully abridged.

197.   Absent injunctive relief, Coach and his children are at risk of not being able to share further school events in accordance with the longstanding custody matters set out by the Court.

## DEFENDANTS LIMITED PLAINTIFFS' RIGHTS IN A RETALIATORY MANNER

198.   Although Coach raised the issue, first privately, then publicly, about the security issues at HPHS, HPHS sought to retaliate against Coach by having him removed from a public event.

199.   Defendants did so to retaliate against Coach for speaking to the media to their embarrassment and to "get even" with him for ensuring the False Claim was kept in the Illinois False Claims Database.

200.    Likewise, HPPD tried to hide public records from Judiociocracy and attempted to use Coach's identity as the reason they should ignore FOIA.

201.    HPPD and HPHS claimed to know exactly who they were dealing with – a parent activist and public records advocate – when they limited Coach's rights. .

202.    HPPD and HPHS have even stymied Plaintiffs' attempts, plus those of the Coalition Opposing Governmental Secrecy, to get FOIA records for the Homecoming game itself, leading to two more valid FOIA lawsuits in Lake County – 2025CH00000262 and 2025CH00000269, against HPPD ("HPPD2") and HPHS, respectively.

203.    Each entity and their employees did so to retaliate for his protected speech.

204.    "We know who you are" they said when wrongfully threatening his arrest. Here, all the Defendants were working together with full knowledge of what they were doing, against whom, and why. That's why they worked together to remove him – with the Defendants sharing each other's retaliatory purpose, joining forces, and restricting Plaintiffs' rights.

**Count I**
*42 U.S.C § 1983, US. Const. Amdts. I, XIV,* and Ill. Const. Art. I § 4 Freedom of Speech
FIRST LIMITATION OF RIGHTS
All Plaintiffs against All Defendants

205.    All Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

206.    Defendants in this Count refer to all Defendants.

207. The Entity Defendants practiced a pattern of retaliating against Plaintiff Coach for his pursuit of his speech rights, and HPPD sough to retaliate against Plaintiff Judiciocracy for its exercise of its First Amendment rights.

208. Thus the Defendants' actions against Plaintiffs were willful and wanton in the deprivation of his rights.

209. Defendants violated Plaintiffs' rights to free speech and public access under the Illinois Constitution Article I § 4 and the United States Constitution Amendments I and XIV when Defendant restricted where Plaintiff could be at Homecoming without any objective reason allowable by law in the First Limitation of Rights.

210. Plaintiffs bring this claim under the Illinois Constitution independently and in the alternative to their federal constitutional claims because the Illinois Constitution provides broader protections than the federal Constitution in certain respects, and Illinois courts have recognized that state constitutional provisions may be independently enforceable.

211. To the extent Defendants may argue that the Tort Immunity Act bars this claim, that argument fails because:

    a. the Act does not immunize intentional constitutional violations motivated by retaliation;

    b. the conduct here was not a "discretionary policy determination" but rather targeted retaliation against a specific individual for protected speech; and

    c. immunity provisions must be strictly construed, and extending immunity to cover First Amendment retaliation would render the Illinois Constitution's free speech protections meaningless.

39

212. "'All Defendants were acting under the color of state law and their actions caused a deprivation of Plaintiffs' rights.

213. Plaintiffs have suffered damages as described above.

214. Plaintiffs have incurred legal fees which are subject to reimbursement or compensation under relevant statute from Defendant's violation of Plaintiff's rights.

215. Also, Plaintiffs risk suffering future damage from Defendant continuing to limit or threaten to limit their rights, absent injunctive and equitable relief.

**<u>Count II</u>**
*42 U.S.C § 1983, US. Const. Amdts. I, XIV,* and Ill. Const. Art. I § 4 Freedom of Speech
SECOND LIMITATION OF RIGHTS
All Plaintiffs against All Defendants

216. All Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

217. Defendants in this Count refer to all Defendants.

218. The Entity Defendants practiced a pattern of retaliating against Plaintiff Coach for his pursuit of his speech rights, and HPPD sough to retaliate against Plaintiff Judiciocracy for its exercise of its First Amendment rights.

219. Thus the Defendants' actions against Plaintiffs were willful and wanton in the deprivation of his rights.

220. Defendants violated Plaintiffs' rights to free speech and public access under the Illinois Constitution Article I § 4 and the United States Constitution Amendments I and XIV when Defendant restricted where Plaintiff could be at

Homecoming without any objective reason allowable by law in the Second Limitation of Rights.

221.    Plaintiffs bring this claim under the Illinois Constitution independently and in the alternative to their federal constitutional claims because the Illinois Constitution provides broader protections than the federal Constitution in certain respects, and Illinois courts have recognized that state constitutional provisions may be independently enforceable.

222.    To the extent Defendants may argue that the Tort Immunity Act bars this claim, that argument fails because:

        a.  the Act does not immunize intentional constitutional violations motivated by retaliation;

        b.  the conduct here was not a "discretionary policy determination" but rather targeted retaliation against a specific individual for protected speech; and

        c.  immunity provisions must be strictly construed, and extending immunity to cover First Amendment retaliation would render the Illinois Constitution's free speech protections meaningless.

223.    All Defendants were acting under the color of state law and their actions caused a deprivation of Plaintiffs' rights.

224.    Plaintiffs have suffered damages as described above.

225.    Plaintiffs have incurred legal fees which are subject to reimbursement or compensation under relevant statute from Defendant's violation of Plaintiff's rights.

226.    Also, Plaintiffs risk suffering future damage from Defendant continuing to limit or threaten to limit their rights, absent injunctive and equitable relief.

## Count III
*42 U.S.C § 1983, US. Const. Amdt. XIV,* and Ill. Const. Art. I § 2 Due Process
FIRST LIMITATION OF RIGHTS
All Plaintiffs against All Defendants

227. All Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

228. Defendants in this Count refer to all Defendants.

229. The Entity Defendants practiced a pattern of retaliating against Plaintiff Coach for his pursuit of his speech rights, and HPPD sough to retaliate against Plaintiff Judiciocracy for its exercise of its First Amendment rights.

230. Thus the Defendants' actions against Plaintiffs were willful and wanton in the deprivation of his rights.

231. Defendants violated Plaintiffs' rights to due process under the Illinois Constitution Article I § 2 and the United States Constitution Amendment XIV when Defendant restricted where Plaintiff could be at Homecoming without any objective reason allowable by law in the First Limitation of Rights.

232. All Defendants were acting under the color of state law and their actions caused a deprivation of Plaintiffs' rights.

233. Plaintiffs have suffered damages as described above.

234. Plaintiffs have incurred legal fees which are subject to reimbursement or compensation under relevant statute from Defendant's violation of Plaintiff's rights.

235. Also, Plaintiffs risk suffering future damage from Defendant continuing to limit or threaten to limit their rights, absent injunctive and equitable relief.

## Count IV
*42 U.S.C § 1983, US. Const. Amdt. XIV,* and Ill. Const. Art. I § 2 Due Process
SECOND LIMITATION OF RIGHTS
All Plaintiffs against All Defendants

236.    All Plaintiffs incorporate the above paragraphs by reference as if fully set forth herein.

237.    Defendants in this Count refer to all Defendants.

238.    The Entity Defendants practiced a pattern of retaliating against Plaintiff Coach for his pursuit of his speech rights, and HPPD sough to retaliate against Plaintiff Judiciocracy for its exercise of its First Amendment rights.

239.    Thus the Defendants' actions against Plaintiffs were willful and wanton in the deprivation of his rights.

240.    Defendants violated Plaintiffs' rights to due process under the Illinois Constitution Article I § 2 and the United States Constitution Amendment XIV when Defendant restricted where Plaintiff could be at Homecoming without any objective reason allowable by law in the Second Limitation of Rights.

241.    All Defendants were acting under the color of state law and their actions caused a deprivation of Plaintiffs' rights.

242.    Plaintiffs have suffered damages as described above.

243.    Plaintiffs have incurred legal fees which are subject to reimbursement or compensation under relevant statute from Defendant's violation of Plaintiff's rights.

244.    Also, Plaintiffs risk suffering future damage from Defendant continuing to limit or threaten to limit their rights, absent injunctive and equitable relief.

**Count V**
*42 U.S.C § 1983* INTERFERENCE IN PARENTAL RIGHTS
Edward "Coach" Weinhaus against all Defendants

245.    Plaintiff Edward "Coach Weinhaus incorporates the above paragraphs by reference as if fully set forth herein.

246.    Defendants sought to retaliate against Coach for his First Amendment activities.

247.    Thus the Defendants' actions against Plaintiffs were willful and wanton in the deprivation of his rights.

248.    Plaintiff is a custodial parent and has full and unfettered access to see or speak to his children at a public event.

249.    Defendants however knowingly interfered with that, threatening to have Coach removed if he went to say hello to his children in the stands or even go into the stands to speak to them.

250.    A custodial parent's rights to his children are sacrosanct.

251.    A custodial parent's rights to be involved in his children's activities are part of parenting but especially when protected by a court order.

252.    There is an even more pressing right outside of the formalities of "custody." A parent has natural rights to his children.

253.    The Defendants violated those rights by both refusing to allow Coach access to the stands or to be a part of his children's school lives by both the First and Second Limitation of Rights.

254.    Due to the Stepfather Abuse allegations by Coach's children's mother, which Dean McCord was made aware in Spring of 2025, See <u>Exhibit A</u>, Dean McCord

knew that the reactions of Coach's children are merely after-affects from being victims in a household where numerous calls to the police were placed in 2024 in conjunction with the Stepfather Abuse.

255. Thus, when the children reached out to Dean McCord once they knew their father was at the game, they did not leave the game nor did they want to leave the game. Instead, they told Dean McCord they wanted to stay and watch the game knowing their father was present.

256. Defendants also needed to make sure not to revisit the chaos of the Stepfather Abuse and frequent police interactions, but rather ensure the children had access to their safe custodial parent. Instead, Dean McCord included the learned pattern of including HPPD, displacing their custodial parent.

257. Dean McCord knew, or should have known, that the children mimicking prior behavior from Stepfather Abuse (as reported by the children's mother) at the game were not the true reactions of children, and instead were trained behavior.

258. But even if Dean McCord didn't know, his only response should have been to include Coach, rather than create an effective Restraining Order against him in the First Limitation of Rights.

259. The children desire to have their relationship with their father protected, and not abused, nor subject them to being abused for wanting the same.

260. Defendants failed the children's cry for help.

261. Rather than protecting and facilitating healthy and safe interactions - where the children could be free from blame or abuse - between rightful custodial

father and children, the Defendants threatened the father and took his place as parent.[5]

262.    Dean McCord, leading the other Defendants, refused to merely allow the Weinhaus children to say *hello* to their father or *vice versa*. In fact, the children, wanting a safe space to allow their father to say "hello" to them without getting in trouble, desperately sought his help to do so in the way typical abuse victims do – something any school administrator should have known.

263.    Coach suffered damages, the loss of access to his children, and being a part of their lives.

264.    Coach has incurred legal fees which are subject to reimbursement or compensation under relevant statute as a result of Defendant's violation of Plaintiff's rights.

265.    Also, Coach risks suffering future damage from Defendant continuing to limit or threaten to limit his rights, absent injunctive and equitable relief.

**Prayer for Relief**

Wherefore, Plaintiffs Children Of The Court, Judiciocracy LLC, and Edward "Coach" Weinhaus respectfully requests that the Court:

a.    Enter Declaratory Judgement for Plaintiffs and Against Defendants finding that Defendants violated Plaintiffs' rights under the First and Fourteenth

---

5.    These are common failings of captured law enforcement and quasi-law enforcement entities. Coach's client (https://tinyurl.com/yc492vw2 ) , Tommy Robinson (né Stephen Yaxley-Lennon) reported on the rape grooming gangs in the UK for more than a decade. When fathers would come to looking to protect the children, the authorities would arrest the fathers. See *Denver Gazette*, "Musk eyes connection between Britain's grooming gangs and censorship" (2/17/2025) https://gazette.com/2025/02/17/musk-eyes-connection-between-britains-grooming-gangs-and-censorship/ .

Amendments by removing Weinhaus from the October 10, 2025, football game in retaliation for protected speech;

      b.     Enter Declaratory Judgement for Plaintiffs and Against Defendant HPHS finding that HPHS's "watch list" policy, as applied to restrict access to public school events based on criticism of school officials rather than objective safety concerns, violates the First Amendment;

      c.     Enter Declaratory Judgement for Plaintiff Weinhaus finding that Weinhaus has a constitutional right to attend his children's public school events consistent with his custodial rights and court orders;

      d.     Enter Declaratory Judgement for Plaintiffs Judiciocracy and Children of the Court and Against Defendants that Judiciocracy and Children of the Court have First Amendment rights to attend public school events for newsgathering and advocacy purposes, subject only to reasonable time, place, and manner restrictions applied in a content-neutral manner;

      e.     Enjoin Defendants from

          i.   Excluding Plaintiffs from public school events held by HPHS unless: (A) the specific individual has engaged in objectively disruptive conduct at the specific event, (B) the exclusion is necessary to maintain order or safety, and (C) the exclusion is based on content-neutral, viewpoint-neutral grounds;

          ii.   Maintaining or enforcing any "watch list" or similar policy that restricts access to public school events based on individuals' prior criticism of school officials, prior exercise of First Amendment rights, or FOIA requests;

          iii.   Threatening arrest or arrest of Plaintiffs at public school events absent probable cause that a crime has been committed;

47

      iv. Retaliating against Plaintiffs for engaging in protected speech, newsgathering, or advocacy activities; and

      v. Keeping Weinhaus on any "watch list" or similar system maintained by HPHS;

    f.     'Enter an award ordering Defendants to pay compensatory damages to Plaintiffs;

    g.     Award punitive damages against Defendants Don McCord, Lane Linder, and Officer Doe 1, Officer Doe 2, and Officer Doe 2 in their individual capacities, in an amount sufficient to punish and deter the willful and wanton deprivation of Plaintiffs' clearly established constitutional rights;

    h.     Enter an award for Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

    i.     Grant any and all further relief that this Court deems just and proper.

Dated: February 5, 2026         Respectfully Submitted:

                         By: /s/ *Adam Florek*

                         Adam Florek
                         Ill. Attn'y No: 6320615
                         **Florek Law, LLC**
                         11 Knollwood Dr.
                         North Caldwell, New Jersey 07006
                         Tele: (929) 229-2268
                         E-mail: aflorek@florekllc.com

                         Antonio Ernesto Valiente-Rivera
                         N.D. Ill. Gen. Bar No.: 12326
                         Torre de La Reina - Suite 203
                         450 Avenida de La Constitucion
                         San Juan, PR 00901
                         Tel: (787) 782-9544
                         Email: lcdoavaliente@live.com

                         Ryan M. Cleys #6326726
                         115 East Irving Park Rd. #936

Streamwood, IL 60107
Ph. (847) 217-7170
Fax. (847) 728-8003
Rmcleys@gmail.com

Edward "Coach" Weinhaus, Esq.
ARDC #6333901
*Only as to the Entity Plaintiffs*
**LegalSolved, LLC, FOIASolved division**
11500 Olive Blvd.
Suite 133
Saint Louis, Missouri 63141-7126
Tele: (314) 580-9580
E-mail: eaweinhaus@gmail.com